Joseph C. DeBlasio, Esq. (Bar ID #018081996)
Michael A. Tecza, Esq. (Bar ID #0335572021)
**JACKSON LEWIS P.C.**
766 Shrewsbury Avenue
East Building, Suite 101
Tinton Falls, New Jersey 07724
T: (732) 532-6148
F: (732) 842-0301
*Attorneys for Defendants Colony Tire Corporation,*
*Scott Creighton, and Charles Creighton*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIK KERTESZ,<br><br>                              Plaintiff,<br><br>        v.<br><br>COLONY TIRE, SCOTT CREIGHTON, CHARLES CREIGHTON, JOHN and JANE DOES 1-10 and ABE CORPS. 1-10,<br><br>                              Defendants. | Hon. _____, U.S.D.J.<br>Hon. _____, U.S.M.J.<br>Civil Action No. _____<br><br>**NOTICE AND PETITION FOR REMOVAL OF CASE FROM THE SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, ESSEX COUNTY** |

TO:    Clerk, United States District Court for the District of New Jersey
       Martin Luther King Building & U.S. Courthouse
       50 Walnut Street
       Newark, New Jersey 07101

       Tyrone A. Blackburn, Esq.
       T.A. Blackburn Law, PLLC
       1242 East 80th St., 3rd Floor
       Brooklyn, NY 11236

Defendants Colony Tire Corporation (improperly pled as "Colony Tire"), Scott Creighton,

and Charles Creighton's, (collectively "Defendants"), pursuant to 28 U.S.C. §§ 1331, 1332, 1367,

1441, and 1446, respectfully submits this Notice and Petition for Removal of a Case from the

Superior Court of New Jersey, Law Division, Essex County, bearing Docket No. ESX-L-4734-24, and as grounds for removal respectfully state as follows:

1.     On July 11, 2024, Plaintiff Erik Kertesz ("Plaintiff") filed a civil action captioned *Erik Kertesz v. Colony Tire, et al.*, Docket No. ESX-L-4734-24, in the Superior Court of New Jersey, Law Division, Essex County ("Complaint").  A true and correct copy of the Complaint in that action is attached hereto as **Exhibit A**.

2.     In the Complaint, counsel for Plaintiff, Tyrone A. Blackburn, Esq., of T.A. Blackburn Law, PLLC, falsely certifies pursuant to New Jersey Court Rule 4:5-1 that there are no matters in controversy that are subject to any other action pending in any other court. *See* **Exhibit A**, p 36.

3.     In reality, the above-referenced State Complaint arises from the exact same set of transactions or occurrences which are already actively being litigated in the United States District Court for the District of New Jersey, *Erik Kertesz v. Colony Tire Corporation, Scott Creighton, Charles Creighton, John and Jane Does 1-10 and ABC Corps. 1-10*, Civil Action No.: 2:20-cv-12364-JKS-JBC ("Pending Federal Lawsuit") presiding before the Honorable Jamel K. Semper, U.S.D.J and the Honorable James B. Clark, III, U.S.M.J.

4.     Mr. Blackburn is well aware of this pending litigation matter because he is the attorney who representing Plaintiff in the Pending Federal Lawsuit.  ***In fact, some of the claims asserted in the Complaint were previously asserted in the Pending Federal Lawsuit in the form of a Motion to Amend the Complaint, which was voluntarily withdrawn by Plaintiff and then re-filed in Superior Court.*** *See* **Exhibit A**.

5.     Scott Creighton and Charles Creighton were each served with a copy of the Summons and Complaint on July 14, 2024 at their respective residences in North Carolina, which

is within thirty (30) days of the filing of this notice and petition for removal. The Summons and Complaint were the initial pleadings received by these individual Defendants setting for the claims upon which Plaintiff's action is based. Likewise, on July 14, 2024, Defendant Colony Tire Corporation was served with a copy of the Summons and Complaint, which is within thirty (30) days of the filing of this notice and petition for removal. The Summons and Complaint were the initial pleadings received by Defendant Colony Tire.

6.     This Notice and Petition for Removal is timely filed within the provisions of 28 U.S.C. § 1446. Defendants have effected removal within thirty (30) days of receipt by it of a paper from which it could first be ascertained that this action is removable. *See* 28 U.S.C. § 1446.

7.     No proceedings have taken place in the state court action. Defendants have not served an Answer or other responsive pleading to Plaintiff's Complaint or made any appearance or argument before the Superior Court of New Jersey, except to file a notice of this Removal Petition pursuant to 28 U.S.C. § 1446(d).

## DIVERSITY OF CITIZENSHIP

8.     The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because it is a civil action between citizens of a state and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This case may therefore be removed pursuant to 28 U.S.C. § 1441.

9.     28 U.S.C. § 1441(a) provides, in relevant part, that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

10.     There is complete diversity of citizenship in this matter between Plaintiff and the

named Defendants. At the time of the filing of the subject Complaint and the filing of this Removal Petition, Plaintiff was and is a citizen and resident of the State of New Jersey.

11.     The named Defendants in the Complaint are all citizens of the State of North Carolina. Colony Tire is a legal corporation organized and existing under the laws of the State of North Carolina. At all relevant times, including the filing of the subject Complaint and the filing of this Removal Petition, Colony Tire's principal place of business has been in Edenton, Chowan County, North Carolina. *Id*. Defendants Scott Creighton and Charles Creighton are both citizens of North Carolina. At all relevant times, including the filing of the subject Complaint and the filing of this Removal Petition, Defendants Scott Creighton and Charles Creighton have been domiciled in Edenton, Chowan County, North Carolina. *Id*.

12.     Thus, because Plaintiff is a citizen of the State of New Jersey, and all named Defendants are citizens of the State of North Carolina, complete diversity of citizenship exists.

## AMOUNT IN CONTROVERSY

13.     Plaintiff seeks recovery of compensatory damages, punitive damages, attorneys' fees, costs, and other legal and equitable relief, but has not specifically enumerated the amount in controversy in the Complaint.  However, the fact that a Complaint does not on its face state the amount it seeks to recover will not defeat diversity jurisdiction.  When a plaintiff has not specified that the amount in controversy is less than the jurisdictional minimum, the defendant need only show that, to a legal certainty, the amount in controversy exceeds the threshold requirement. *See Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 397-98 (3d Cir. 2004); *see also Raspa v. Home Depot*, 533 F. Supp. 2d 514 (D.N.J. 2007) (legal certainty test satisfied by demand for compensatory damages, punitive damages, and attorneys' fees).

14.     Here, Plaintiff alleges tortious interference of prospective employment, violations

4

of the New Jersey Wage Payment Law ("NJWPL"), unjust enrichment, and discrimination and/or retaliation based on disability in violation of the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5- 1 – 49, ("NJLAD"), all of which are based on alleged underlying violations of the Health Insurance Portability and Accountability Act ("HIPAA") and Family Medical Leave Act ("FMLA") *See generally*, **Exhibit A**. Relatedly, Plaintiff alleges that his starting salary while working for Colony Tire was $275,000.00. *See*, **Exhibit A**, p. 14, ¶ 95. In addition, Plaintiff alleges that he has suffered severe emotional distress, conscious pain and suffering, severe and disabling emotional injuries, and "permanent injury with physiological consequence," and that the "severity and permanency of plaintiff's injuries have required and will continue to require expenditure of large sums of money for necessary care and treatment." *See*, **Exhibit A**, pp. 28, ¶ 192. Thus, the entire amount in controversy clearly contemplates an amount exceeding the sum or value of $75,000. *Raspa v. Home Depot*, 533 F. Supp. 2d 514 (D.N.J. 2007) (legal certainty test satisfied by demand for compensatory damages, punitive damages, and attorneys' fees); *Peters v. Stop & Shop*, No. 13-6085, 2013 U.S. Dist. LEXIS 153823, at *11 (D.N.J. Oct. 25, 2013) (allegations of severe and permanent injury can be sufficient for removal).

15.    Therefore, this Court has original jurisdiction over Plaintiff's claims by virtue of diversity of citizenship and satisfaction of the amount in controversy requirement of 28 U.S.C. § 1332(a)(2). Thus, this action may be removed to this Court pursuant to 28 U.S.C. § 1441(a).

16.    All of the named Defendants have consented to this Notice and Petition for Removal. *See Green v. Am. Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003) ("The general rule that all defendants must join in a notice of removal may be disregarded where, as here, the non-joining defendants are unknown.")

17.    Defendants submit this Notice and Petition for Removal without waiving any

defenses to the claims asserted by Plaintiff and without conceding that Plaintiff has pleaded claims upon which relief may be granted.

## FEDERAL-QUESTION JURISDICTION

18.     In addition to diversity jurisdiction, this Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 based on this Court's federal-question jurisdiction.

19.     Pursuant to 28 U.S.C. § 1331, the district courts have original jurisdiction of all civil actions arising under alleged violations of the laws of the United States. Specifically, the underlying basis in this action involves claims of alleged acts violating federal statutes HIPAA, *see* **Exhibit A**, pp. 2, 18-19, 27, ¶¶ 9, 126-129, 132-36, and 188, and the FMLA. *See* generally, **Exhibit A**. Accordingly, this action is removable to this Court pursuant to 28 U.S.C. § 1441(a).

20.     Additionally, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all claims and issues alleged in the Complaint, as each of Plaintiff's claims arises from the same set of transactions or occurrences that would ordinarily be expected to be tried in a single judicial proceeding, which are currently being litigated in the Pending Federal Lawsuit.

21.     Accordingly, this action is removable to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1331, 1367(a) and 1441(a).

## VENUE

22.     Pursuant to 28 U.S.C. §§ 1441(a), venue lies in the United States District Court for the District of New Jersey because the state action was filed in this District.

## NOTICE

23.     Pursuant to 28 U.S.C. § 1446(d), Defendant has given written notice of the removal of this action to all adverse parties and has filed a copy of this Notice with the Clerk of the Superior Court of New Jersey, Law Division, Essex County.

24.     By copy of this document, and in accordance with the Certificate of Service, Defendants are providing notice to all parties in this action of the filing of this Notice of Removal pursuant to 28 U.S.C. § 1446(d).

**WHEREFORE**, Defendants respectfully request that the action, now pending in the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESX-L-004734-24, be removed to the United States District Court for the District of New Jersey.

Respectfully submitted,

**JACKSON LEWIS P.C.**
766 Shrewsbury Avenue
East Building, Suite 101
Tinton Falls, New Jersey 07724
T: (732) 532-6148
*Attorneys for Defendants Colony Tire Corporation,*
*Scott Creighton, and Charles Creighton*

By: /s/ *Joseph C. DeBlasio*
        Joseph C. DeBlasio
        Michael A. Tecza

Dated: August 12, 2024

4890-0610-7864, v. 1

# EXHIBIT A

**Tyrone Blackburn, Esq.**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Attorney for Plaintiff, Erik Kertesz*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – ESSEX COUNTY

| | |
|---|---|
| ERIK KERTESZ,<br><br>                    Plaintiff,<br><br>-against-<br><br>COLONY TIRE,<br>SCOTT CREIGHTON,<br>CHARLES CREIGHTON,<br>JOHN and JANE DOES 1-10 and<br>ABC CORPS.  1-10<br><br>                    Defendants | DOCKET NO.:<br><br>CIVIL ACTION<br>**Complaint**<br>**Jury Demand** |

Plaintiff Erik Kertesz ("Plaintiff Kertesz" of "Mr. Kertesz"), by and through his attorney, T.A. Blackburn PLLC, upon their knowledge and belief, and as against Colony Tire, Scott Creighton, Charles Creighton, John and Jane Doe's 1-10 and ABC Corps.  1-10 asserts as follows:

1. Mr. Kertesz brings this action to remedy violations of the New Jersey Wage Payment Law, unjust enrichment, tortious interference with an employment opportunity, defamation of character (slander), and other related violations.

## **PARTIES**

2. Plaintiff Erik Kertesz ("Plaintiff Kertesz" or "Mr. Kertesz") is an adult individual residing in New Jersey.

3. Defendant Colony Tire Corporation ("Defendant Colony Tire" or "Defendant Corporation") is an active corporation registered in New Jersey.  Its address is 820 Bear Tavern Road, West Trenton, NJ 08628.

4. Defendant Charles Creighton ("Defendant Charles Creighton" or "Defendant Creighton") owns Colony Tire, with a New Jersey address of 820 Bear Tavern Road, West Trenton, NJ 08628.

1

5. Defendant Scott Creighton ("Defendant Scott Creighton" or "Defendant Scott") is an individual who works for Colony Tire, with a New Jersey address of 820 Bear Tavern Road, West Trenton, NJ 08628.

6. During the relevant period, Defendants John and Jane Does 1-10 are unknown individuals and employees who aided and abetted in the commission of conduct complained of herein. They acted within the scope of their employment. Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

7. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities employed by Plaintiff or aided and abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

8. At all relevant times hereto, Defendants collectively were Mr. Kertesz's "employer," as defined under New Jersey Wage Payment Law.

9. At all relevant times hereto, Defendants collectively were Mr. Kertesz's "health-plan provider," "health plan administrator," and "health care provider" as that term is defined under the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, Public Law 104-191.

## JURISDICTION AND VENUE

10. The venue is properly set in Essex County as Plaintiff Kertesz felt the impact of Defendant's tortious interference with his employment opportunities in Essex County. Plaintiff Kertesz felt the impact of Defendant's violation of Wage Payment Law and Unjust Enrichment in New Jersey.

11. This Court has personal jurisdiction over Defendants according to and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    i. The transaction of any business within the state;

    ii. The making of any contract within the state;

    iii. The commission of a tortious act within this state; and

    iv. The ownership, use, or possession of any real estate in this state.

12. Colony Tire is an active corporation registered in New Jersey. Its original filing date was May 23, 2017, and its last annual report was filed in 2024.

13. Upon securing their registered corporation status, Colony Tire intentionally sought out Mr. Kertesz, a New Jersey resident with extensive senior management and tire industry experience, to help manage two of their most prominent New Jersey vendors to execute various business endeavors and opportunities Colony Tire sought out in New Jersey.

14. Colony Tire is a member of the Tire Alliance Group (TAG), a New Jersey-based tire purchasing group and the largest of its kind in North America. TAG is comprised of approximately 35 members, with over 5,000 retail automotive outlets and over 100 distribution and commercial centers. TAG members partner with multiple tire manufacturers and tire-related companies in North America and globally to negotiate supply agreements that provide them with exclusivity of major brand products and services.

15. Defendant Colony Tire is one of the most prominent members of TAG with both Scott Creighton (President of Colony Tire) and Andrew Bergeron (COO of Colony Tire) having sat on the board of directors.

16. According to information and belief, as detailed below, Defendants used their relationships and power as Board members of TAG to blacklist Plaintiff from employment opportunities with TAG and TAG-related companies.

17. From May 23, 2017, to the date of this filing, Colony Tire has consistently and purposefully availed itself of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of New Jersey law. In return for these benefits and protections, Colony Tire must submit to the burdens of litigation in Newark, New Jersey.

18. On or about October 18, 2019, at 3:32 pm, Scott Creighton purposefully directed an email to two New Jersey vendors, 13 other vendors, 202 Atlantic Tire employees, and sales representatives.

   a. Specifically, Scott Creighton purposefully directed an email to American Tire and Wheel Centers Inc. (ACT) and Husky Tires.

19. On or about July 17, 2019, Mr. Kertesz was working in New Jersey when he informed defendant Charlie Creighton that a biopsy confirmed that a tumor in his throat was positive

for cancer. Approximately a week later, or about July 23, 2019, while Mr. Kertesz was working in New Jersey, senior management decided to change Mr. Kertesz's job title.

20. On or about August 13, 2019, Mr. Kertesz was working in New Jersey when defendants Charlie and Scott Creighton purposely called him to tell him they were changing his job title, effective immediately.

21. Two days later, on or about August 15, 2019, Mr. Kertesz was working in New Jersey when defendants Charlie and Scott Creighton called him and forced him to go out on "FMLA leave," effective immediately. Defendants intentionally required that Plaintiff continue to work from New Jersey despite forcing him to take FMLA leave.

22. On or about August 15, 2019, to November 11, 2019, Mr. Kertesz was in New Jersey when defendants Charlie and Scott Creighton and/ or Colony Tire HR interfered with, restrained, and/or denied Plaintiffs the ability to exercise his FMLA rights. Defendants did not reassign Plaintiff's work-related responsibilities to other employees; instead, defendants encouraged employees, customers, senior management, etc., to continue to contact Plaintiff daily regarding work-related matters.

23. On or about August 15, 2019, to November 11, 2019, Mr. Kertesz was in New Jersey when defendants Charlie and Scott Creighton intentionally made Plaintiff work, paying Plaintiff by using his accrued vacation and or sick time.

24. On or about October 31, 2019, approximately 11 days before the expiration of Mr. Kertesz's alleged "FMLA leave," defendants Charlie and Scott Creighton sent Mr. Kertesz a new employment agreement while he was in New Jersey.

25. On or about October 31, 2019, Mr. Kertesz was in New Jersey when defendants Charlie and Scott Creighton demoted Mr. Kertesz in terms of job responsibilities, compensation, and commission-earning potential.

26. On or about November 20, 2019, Mr. Kertesz was working in New Jersey when he emailed the defendants to inform them that he potentially needed an accommodation.

27. On or about November 25, 2019, approximately 5 days after Mr. Kertesz notified the defendants that he potentially needed a work accommodation, the defendants terminated Mr. Kertesz's employment at Colony Tire.

28. This litigation arises from or relates to Scott Creighton and Charles Creighton's tortious interference with plaintiffs' post-employment opportunities, as well as Defendants act of

stealing plaintiffs' wages and unjustly enriching themselves in violation of New Jersey's Wage Payment Law.

29. Requiring Defendants to litigate these claims in New Jersey does not offend traditional notions of fair play and substantial justice. Plaintiff Kertesz's claims arise from conduct occurring at Colony Tire by Defendants in New Jersey.

## **NATURE OF ACTION**

30. On or about January 2024, while in New Jersey and Essex County, Mr. Kertesz applied for 11 job vacancies in which the potential employers are active members of TAG. On the applications, the plaintiff listed his recent employment history, including Colony Tire with defendants Charles Creighton, CEO, Scott Creighton, President, and Andrew Bergeron (Charlie's son-in-law), COO.

31. Mr. Kertesz applied for two different positions with Ascenso Tire, two different positions with Falken Tire, two different positions with Yokohoma Tire, and one position at each of the following: ATC, Kuhmo, Ling Long, Pirelli, and Unicorn. Each of these companies are active TAG members.

32. Mr. Kertesz was qualified for each of the 11 positions he applied to, yet he was rejected for all 11 of them after the potential employers and active TAG members contacted defendant Colony Tire and spoke with Scott and/or Charles Creighton.

33. On or about January 2024, Mr. Kertesz applied for the Director of Logistics position with Ralson Tire North America. He was qualified for the position. Jim Mayfield, the President of Ralson North America, initially interviewed Mr. Kertesz on 1/17/2024. There was a second interview on 1/19/2024, which included Mr. Kertesz, Jim Mayfield, Rakesh Amol, Global President of Ralson Tire, and Brian Sheehey, Senior Vice President of Ralson North America.

34. The feedback regarding Mr. Kertesz's interviews was extremely positive. After the interviews, Mr. Kertesz spoke with Jim Mayfield again, and he offered him the position. Mr. Mayfield sent a job offer, and Mr. Kertesz was agreeable to the terms of it. Mr. Mayfield informed Mr. Kertesz that he intended to speak with Charles and Scott Creighton, two individuals he had known for many years. Mr. Mayfield indicated that he would be in touch with Mr. Kertesz soon thereafter. Within 24 hours of speaking with

Scott and/or Charles Creighton, Mr. Mayfield rescinded the job offer from Mr. Kertesz. Mr. Kertesz followed up and requested feedback, but there was no further communication from Mr. Mayfield.

35. During Mr. Kerteszs employment as General Manager of Bergey's Commercial Tires in New Jersey his boss, Jim Gavaghan, informed him that the company wanted to liquidate an underperforming business location in Harrisonburg Virginia. Mr. Kertesz's boss requested that he seek potential buyers and/ or renters for this location. Mr. Kertesz sought out several companies but was not successful in securing a buyer/ tenant. Mr. Kertesz's boss informed him that he had secured a tenant and that Mr. Kertesz would be responsible for overseeing the transaction. To Mr. Kertesz's dismay, it was revealed to him by his boss that the new tenant was Colony Tire.  Defendant Charles Creighton refused to proceed with the transaction if Plaintiff was involved.  Mr. Kertesz's boss was compelled to oversee the transaction instead.

36. The business relationship between Bergey's Tire and Colony Tire grew following the above-mentioned transaction. Bergey's Tire actively sought to establish new business relations with Colony Tire regarding the sale of retread tires.

37. Shortly thereafter, Mr. Kertesz was released from his employment with Bergeys Tire. Upon information and belief, Defendant Charles Creighton caused Bergeys to end Plaintiff's employment in exchange for increased business opportunities.

38. Soon after Mr. Kertesz was released from his employment with Bergeys Tire, he learned from a former coworker that his former boss, Jim Gavaghan, had traveled to North Carolina to meet with defendant Colony Tire and discuss new retread business opportunities.

39. According to the City of Harrisburg, Virginia, property records, Colony Tire occupies 190 Charles Street, Harrisburg, Virginia. Bergeys Realty Company is listed as the property owner.

40. On or about January 2020, Mr. Kertesz applied for the Director of Installation with Simple Tire. Mr. Kertesz was qualified for the position he applied for. Mr. Kertesz went through two rounds of interviews and was informed by the COO, Josh Chafolsy, that he would be contacted to learn the next steps. Mr. Chafolsy indicated that he would speak with Mr. Kertesz's previous employers, including Scott and/or Charles Creighton, two individuals

he had known for many years as defendant Colony Tire is one of Simple Tire's largest distributors.  Soon after Mr. Chafolsy spoke with Scott and/or Charles Creighton, Mr. Kertesz was notified by Simply Tire's HR personnel, Kathileen McCarty, that the position was no longer available. Simply Tire then proceeded to repost the position, and Mr. Kertesz reinstated his application, which was summarily denied.

41. On or about February 27, 2024, Mr. Kertesz applied for a position with Tire Agent. Sarena Davis, a recruiter, contacted him on 3/06/2024 and scheduled an interview with Shondia Britt, HR manager, for 3/8/2024. Mr. Kertesz had a second interview with Johana Stollera, Senior VP of Finance, on 3/14/2024 and a third interview with Jared Kugel, CEO, on 3/18/2024.

42. Mr. Kugel informed Mr. Kertesz during his interview that he intended to speak with his previous employer Colony Tire representatives Charles and/or Scott Creighton, two individuals he had known for many years and currently does a substantial amount of business with.

43. The interview with Mr. Kugel went very well, and sometime shortly thereafter, Mr. Kugel contacted Mr. Kertesz and asked Plaintiff to come to the office in New York City to meet with him and discuss the position further.  Mr. Kugel indicated that he would contact Scott and Charles Creighton and would be traveling until the end of the month and could meet with Plaintiff upon his return.  After Mr. Kugel spoke with Charles and Scott Creighton, Mr. Kertesz asked Mr. Kugel to let him know when he would be available.  Mr. Kugel did not respond to Mr. Kertesz's.

44. Mr. Kertesz has contacted Mr. Kugel on more than one occasion, but to date, there has been no response.  Mr. Kertesz believes that Charles and Scott Creighton are responsible for Mr. Kugel's decision to inexplicably ghost the plaintiff without any explanation.

45. In April 2024, Mr. Kertesz applied for a position with Sumitomo Tire. Plaintiff interviewed with Cliff Stewart, Director of Commercial Tires, on or about April 26, 2024. The interview went well, and Mr. Stewart indicated that he would contact Scott and Charles Creighton to check the Plaintiff's employment reference.  He informed the plaintiff that he would be in touch the following week to let him know what the next steps would be.

46. Two weeks passed without communication, so Mr. Kertesz sent an email on 5/14/2024 to follow up. Mr. Stewart responded, indicating that he would contact the Plaintiff no later than the following week.

47. Two more weeks passed with no communication, so Mr. Kertesz sent an email on 6/3/2024 to follow up.

48. On June 17, 2024, Mr. Kertesz received an email indicating that he was not being offered a position with Sumitomo.

49. Defendant Colony Tire is Sumitomo's largest customer in North America. Sumitomo has a longstanding relationship with defendants Charles and Scott Creighton, two individuals they have known for many years and currently do a substantial amount of business with.

50. Between July 2023 to June 2024, Mr. Kertesz applied for nine different positions at TBC Corporation, a large vendor of defendant Colony Tire. Mr. Kertesz provided Scott and Charles Creighton down as the point of contact for Colony Tire. Mr. Kertesz was qualified for each of the nine jobs but was not interviewed for any.

51. On or about April 26, 2024, Mr. Kertesz applied for the Director of Sales (East) at Toyo Tire. Mr. Kertesz is qualified for the job but received an email indicating that they would not be moving forward with an interview. Defendant Colony Tire is one of Toyo Tire's largest customers in North America.

52. On or about June of 2024, Mr. Kertesz's attorney contacted the defendant's attorney notifying him that if the defendants did not stop defaming and blacklisting Mr. Kertesz, he intended to file additional claims. The defendant's attorney did not deny the allegations.

53. Instead, the defendant's attorney agreed to speak with his clients, subsequently contacting Adora Ambrose, HR manager at Colony Tire, via email, informing her as to how they were required to respond to inquiries about Mr. Kertesz's employment at Colony Tire.

54. Despite their attorney's legal advice, the defendants have continued their illicit behavior to date.

55. This is not unusual behavior for defendants. On or about September 4, 2020, a case was removed from Essex County courthouse to the US District Court of New Jersey, Newark. The case number is 2:20-cv-12364-JKS-JBC. The Case name is Kertesz v. Colony Tire Corporation et al ("Kertesz 1"). During depositions in Kertesz 1, they admitted to four of

the five causes of action and, as per the transcript, exhibited no remorse for their actions and the harm their actions caused Plaintiff to suffer.

56. Defendants also admitted to and provided definitive evidence of two cases of willful and large-scale insurance fraud.

## FEDERAL COURT ACTION

57. In Kertesz 1, Plaintiff raised claims for invasion of privacy (Counts 1-3 and 5) and disability discrimination (retaliation).

58. The parties have completed discovery, and during depositions, the Defendants admitted four of the five causes of action (the invasion of privacy causes of action).

59. In Kertesz 1, during deposition, the Plaintiff discovered that the defendants intentionally made him work while undergoing chemotherapy and knowingly paid him with his vacation and sick pay, as opposed to paying him regular pay.  Defendants did this for the sole purpose of unjustly enriching themselves.

60. During depositions, defendant Colony Tire admitted it is self-insured and self-funded, using the company's general assets to pay healthcare costs.

61. During depositions, defendant Colony Tire admitted that they are responsible for all first dollar claims as they come due.

62. During depositions, defendant Colony Tire admitted they have contracts with stop-loss insurance carriers to mitigate large medical healthcare costs. Reimbursement of first-dollar claims is subject to strict requirements.

63. During discovery, Mr. Kertesz learned that the defendant, Colony Tire, had willfully submitted falsified paperwork to their stop loss insurance carrier (Cigna), claiming that Mr. Kertesz had taken FMLA leave for his heart attack in the first quarter of 2019. Defendants did this for the sole purpose of unjustly enriching themselves.

64. During discovery, Mr. Kertesz learned that defendant Colony Tire had submitted falsified paperwork to their stop loss insurance carrier (Cigna) claiming that Mr. Kertesz had used his accrued sick and vacation pay while on "FMLA leave" for his heart attack in the first quarter of 2019. Defendants did this for the sole purpose of unjustly enriching themselves.

65. In the first quarter of 2019, when the Defendants submitted the paperwork to the stop-loss insurance carrier (Cigna), they were fully aware and familiar with the rules surrounding

the Family Medical Leave Act (FMLA), including the rule that states an employee is entitled to 12 weeks of FMLA leave in a 12-month period.

66. During discovery, Mr. Kertesz learned that defendant Colony Tire had submitted fraudulent paperwork to their stop loss insurance carrier (Cigna) to get reimbursed for Mr. Kertesz's medical treatment for his heart attack. Defendants did this for the sole purpose of unjustly enriching themselves.

67. During a deposition on January 12, 2024, defendant Scott Creighton admitted to telling Colony Tires' stop loss insurance carrier (Cigna) that Mr. Kertesz had taken FMLA leave for his heart attack in the first quarter of 2019. Defendants did this for the sole purpose of unjustly enriching themselves.

68. During a deposition on January 12, 2024, defendant Scott Creighton admitted that his voice was on a recorded call stating that the defendants "had to lie to the insurance company to get Plaintiffs medical bills from his heart attack paid by Cigna." Defendants did this for the sole purpose of unjustly enriching themselves.

69. Prior to depositions, Mr. Kertesz strongly suspected that the defendant had engaged in fraudulent behavior, but it wasn't until Colony Tire provided documentation during discovery and confirmed the same information during depositions that Mr. Kertesz knew with certainty that his suspicions were irrefutable.

70. In the first quarter of 2019, when the Defendants falsely told their stop loss insurance carrier (Cigna) that Mr. Kertesz was on FMLA leave for his heart attack, they intentionally made Plaintiff work. Mr. Kertesz was paid regular pay and did not use his accrued vacation and/ or sick time. The defendants did this for the sole purpose of unjustly enriching themselves.

71. During a deposition on January 12, 2024, defendant Scott Creighton admitted to lying, when he told Colony Tires' stop loss insurance carrier (Cigna) that Mr. Kertesz had used his accrued vacation and sick days during his FMLA leave for his heart attack in the first quarter of 2019. Defendants did this for the sole purpose of unjustly enriching themselves.

72. Prior to depositions, Mr. Kertesz strongly suspected that the defendant had engaged in fraudulent behavior, but it wasn't until Colony Tire provided documentation during discovery and confirmed the same information during depositions that Mr. Kertesz knew with certainty that his suspicions were irrefutable.

73. In Kertesz 1, during depositions, Defendants admitted that they changed stop loss insurance policies from Cigna to Employment Benefits Underwriters as of August 1, 2019. Defendants did this for the sole purpose of unjustly enriching themselves.

74. Prior to depositions, Mr. Kertesz strongly suspected that the defendant had changed insurance policies, but the defendant refused to provide this information. Mr. Kertesz sent several certified letters to the defendant requesting insurance information, including but not limited to stop loss insurance. Defendant Colony Tire repeatedly ignored Mr. Kertesz's requests, even going as far as providing false information to the Department of Labor.  It wasn't until Colony Tire provided documentation during discovery and then confirmed the same information during depositions that Mr. Kertesz knew with certainty that his suspicions were irrefutable.

75. In Kertesz 1, Defendant Charlie Creighton admitted that he had requested that Mr. Kertesz submit "all of his medical bills prior to August 1, 2019, when the new stop loss policy became effective". Defendants did this for the sole purpose of unjustly enriching themselves.

76. In Kertesz 1, during discovery and depositions, Mr. Kertesz became aware of defendants' financial motives for intentionally making him work while undergoing chemotherapy and knowingly paying him with his vacation and sick pay instead of regular pay. Defendants did this for the sole purpose of unjustly enriching themselves.

77. Prior to depositions, and based on several factors, Mr. Kertesz strongly suspected that the defendants' motives were financial. However, it wasn't until Colony Tire and others provided documentation during discovery and confirmed the same information during depositions that Mr. Kertesz knew with certainty that his suspicions were irrefutable.

78. In Kertesz 1, during discovery, Mr. Kertesz obtained an aggregate monthly medical insurance claims report. According to this report, in July 2019, prior to Mr. Kertesz's cancer treatments being approved, the "aggregate loss ratio" was "79.7 %," or 79.7 cents of every insurance premium dollar had already been used to pay claims, clinical services, etc. The report noted that large, unforeseen medical claims can create catastrophic financial losses for self-insured employers.

79. During discovery, Mr. Kertesz learned that as of about November 16, 2019, six days before Mr. Kertesz was terminated, he had accumulated approximately $1,098,356.89 in medical

bills for cancer treatments/medication. This amount does reflect the costs in the first quarter of 2019 when he had open heart surgery following a heart attack, and was the motivating factor in the defendant's decision to terminate his employment, as the cost of these medical expenses would have impacted the Defendant's general assets.

80. In Kertesz 1, during depositions, defendant Charles Creighton admitted that it was his voice that could be heard in a recorded conversation stating that Mr. Kertesz had "a bad year" in terms of his health, incurring large unforeseen medical bills.

81. In August of 2019, when Defendants Scott and Charles Creighton switched Colony Tires stop loss insurance carrier from Cigna to EBU they were fully aware and familiar with the rules surrounding the Family Medical Leave Act (FMLA), including the FMLA rule that states an employee is entitled to 12 weeks of FMLA leave in 12 months.

82. In Kertesz 1, during discovery and depositions, Mr. Kertesz became aware of the defendant's motive for intentionally changing stop-loss insurance policies before the Plaintiff's cancer treatments were approved. Defendants did this for the sole purpose of unjustly enriching themselves.

83. In Kertesz 1, during discovery and depositions, Mr. Kertesz learned that Defendants had undeniably lied to Cigna stop-loss insurance in the first quarter of 2019 regarding Mr. Kertesz's FMLA status. Since the defendant lied to Cigna, they could not possibly tell them that Mr. Kertesz was on FMLA leave again during the third quarter of the same year.

84. Instead, the defendant changed stop-loss insurance carriers, claiming again Mr. Kertesz was on FMLA while intentionally making him work. Defendants did this for the sole purpose of unjustly enriching themselves.

85. In Kertesz 1, during discovery and depositions, Mr. Kertesz learned that Defendant Colony Tire had irrefutably acquired the stop loss policy with Employment Benefit Underwriters (EBU) under false pretense. The defendants did this for the sole purpose of unjustly enriching themselves.

86. In Kertesz 1, during discovery and depositions, Mr. Kertesz obtained documents that defendant Charlie Creighton had falsified, signed, and submitted to stop loss insurance carrier Employment Benefit Underwriters (EBU) during the application process and/ or disclosure phase to obtain coverage. Defendant Charlie Creighton admitted to this during depositions. The defendants did this for the sole purpose of unjustly enriching themselves.

87. In Kertesz 1, during discovery, Mr. Kertesz learned that Colony Tire intentionally did not identify Mr. Kertesz as high risk in the contingencies section of the stop loss policy application with Employment Benefit Underwriters (EBU). Defendants did this for the sole purpose of unjustly enriching themselves.

88. In Kertesz 1, during discovery, Mr. Kertesz learned that Defendant Colony Tire intentionally omitted a minimum of 13 different medical appointments and very specific medications from the stop loss policy application that they submitted to Employment Benefit Underwriters (EBU). Defendants undeniably did this for the sole purpose of obtaining coverage under false pretenses and unjustly enriching themselves.

89. In Kertesz 1, during depositions, the defendants admitted to knowing about Mr. Kertesz's medical appointments, including those 13 that were intentionally omitted by the defendant from the stop loss policy application.

90. On or about December 2, 2019, EBU identified a disclosure issue related to a reimbursement request in the amount of $124,389.01.

91. During discovery and depositions, Mr. Kertesz obtained documents, directly related to this disclosure issue, that defendant Charlie Creighton falsified, signed, and submitted to stop loss insurance carrier Employment Benefit Underwriters (EBU) during the application process and/or disclosure phase to obtain coverage.

92. As per pages 540 & 561 of these stop-loss insurance application documents: "Any person with the intent to injure, defraud, or deceive an insurer or insurance claimant is guilty of a crime (Class H felony) which may subject the person to criminal and civil penalties." N.C.G.S. 14-100 makes offenses of $100,000 or more a Class C felony. Page 540 is signed by Andrew Bergeron, Vice President, and Page 561 by Charlie Creighton, CEO.

## FACTUAL ALLEGATIONS

93. Mr. Kertesz is a 55-year-old Caucasian male. He is a husband and a proud father of three. Mr. Kertesz has lived in the state of New Jersey his whole life. He is highly knowledgeable about tires and has worked in the tire industry for close to thirty years.

94. Mr. Kertesz began his career as an entry-level Customer Service Advisor. Through hard work, dedication, and determination, he mastered his craft and rose to the rank of senior management. This senior management experience led Carl Koester of Tire Jobs to seek

Mr. Kertesz out and recruit him on behalf of Colony Tire to be their General Manager for Colony Tire's Atlantic Tires division.

95. Colony Tire hired Mr. Kertesz on August 15, 2017, as General Manager of Atlantic Tire Distributors. Mr. Kertesz's starting salary was 250,000.00 thousand dollars.

96. Mr. Kertesz excelled in this position, earning an additional 225,000 thousand dollars in 2018 in compensation directly related to company profitability.

97. As a General Manager, Mr. Kertesz was responsible for Atlantic Tire, including but not limited to sales, vendor relations, logistics, operations, warehousing, expansion, staffing, P&L responsibility, etc. Mr. Kertesz managed a team of 202 employees and an annual budget of $100,000,000.00 in sales.

### MR. KERTESZ SERVED AS COLONY TIRES NEW JERSEY AGENT

98. Colony Tire hired Mr. Kertesz as their agent and representative to execute various business endeavors and opportunities Colony Tire sought out in New Jersey.

99. In particular, one of Colony Tire's primary business interests in New Jersey is the execution of federal contracts. Each federal contract lists Colony Tire as the awarded vendor "doing business as" Atlantic Tire Distributors.

100.     On May 23, 2017, Colony Tire registered as a foreign profit corporation in New Jersey. A foreign profit corporation is a company formed in another state that is interested in conducting business in New Jersey. Foreign-profit corporations are required to file yearly annual reports.

101.     As a foreign-profit corporation, Colony Tire has consistently filed its annual reports. The last annual report was filed on February 12, 2020.

102.     Upon securing their foreign profit corporation status, Colony Tires intentionally sought out Mr. Kertesz, a New Jersey resident with extensive senior management tire industry experience, to help manage two of their most prominent New Jersey vendors and execute various business endeavors and opportunities. Colony Tire sought out in New Jersey.

103.     Upon his employment with Colony Tire, Mr. Kertesz consistently worked in New Jersey. A typical workweek schedule was Friday, Saturday, Sunday, and Monday in New Jersey and Tuesday, Wednesday, and Thursday in North Carolina.

14

| Weekday | New Jersey | North Carolina |
|---|---|---|
| Sunday | X | |
| Monday | X | |
| Tuesday | | X |
| Wednesday | | X |
| Thursday | | X |
| Friday | X | |
| Saturday | X | |

104.  Throughout his tenure, there were extended periods when Mr. Kertesz worked solely in New Jersey.  Additionally, he was not required to relocate to North Carolina.

105.  While in New Jersey, Mr. Kertesz held meetings with vendors, negotiated contracts, managed his team, and executed various business endeavors and opportunities Colony Tire sought in New Jersey.

106.  Throughout his employment, Mr. Kertesz maintained his residency in NJ.  This is reflected in his tax filings of a North Carolina nonresident schedule (D-400 Sch PN).

**MR. KERTESZ WAS AN EXCEPTIONAL EMPLOYEE**

107.  While working with the respondent, Mr. Kertesz was praised for his work performance and vision for accelerating Atlantic Tire Distributors' growth.  He developed an IT strategy to move the company forward and reduce operating expenses.

108.  Sales performance and growth were excellent under his guidance—sales in 2017 were $81,352,268.00.   In 2018, $95,697,219.00, and projections for 2019 were $105,000,000.00.  Under Mr. Kertesz's guidance, 2 new warehouses were opened, and an approximately 150,000-square-foot addition was added to the Edenton warehouse.

109.  Mr. Kertesz never exhibited any performance issues, as evidenced by his never being written up or reprimanded for his work.

**MR. KERTESZ SUFFERED SEVERAL HEALTH CHALLENGES IN 2019**

110.  On January 31, 2019, Mr. Kertesz had a heart attack that required double bypass surgery.  While in recovery, Mr. Kertesz continued fully executing his role as General Manager.  Mr. Kertesz was not required to take FMLA or ADA Disability Leave.  On February 7, 2019, Mr. Kertesz was released from the hospital.

111.     On or about mid-March 2019, Mr. Kertesz began experiencing ear pain and headaches.  Mr. Kertesz visited several doctors over the next few months, and on June 14, 2019, a doctor in NC discovered a large mass in Mr. Kertesz's throat.

112.     On June 17, 2019, Mr. Kertesz called Scott Creighton at 11:26 am and told him the doctor had found a mass in his throat.  Mr. Kertesz also told him he could get an appointment at the University of Pennsylvania Medical in the upcoming week with a team of highly specialized physicians.

113.     On or about July 17, 2019, Mr. Kertesz informed defendant Charlie Creighton that a biopsy confirmed that his tumor was positive for cancer.

### COLONY TIRE USED MR. KERTESZ MEDICAL CONDITION TO MAKE AN EMPLOYMENT DECISION

114.     On August 13, 2019, senior management called Mr. Kertesz to notify him that his job was being changed immediately.  Charlie Creighton said the decision had been made two and a half weeks prior, approximately one week after Mr. Kertesz told senior management he had cancer.  At 5:34 pm, Senior management announced an immediate change in personnel.  Without explanation, Mr. Kertesz was demoted from General Manager to Sales Manager.  Before this demotion, Mr. Kertesz never received a bad performance review, customer complaint, or profit loss.

115.     In the "Personnel Change" announcement of Mr. Kertesz's demotion, Colony Tire said the following:

> "Erik Kertesz and our Atlantic Tire/ Atlantic Mighty/ Colony Tire sales team have done a fantastic job of growing our business.  Erik will direct his focus on the amazing sales growth that we continue to experience in Atlantic Tire."

116.     Before the corporate-wide announcement, at 12:57 pm, Mr. Kertesz sent an email to Charlie Creighton, Scott Creighton, and Andrew Bergeron requesting the new job description and terms of employment in writing.  Charlie Creighton responded at 2:16 pm but did not provide the requested documentation and assured Mr. Kertesz that he would still operate under the "same employee agreement." Mr. Kertesz responded at 2:56 pm, stating that he still wanted his new job description and terms of employment in writing

16

despite Charlie Creighton's assurances.  Charlie Creighton again assured Mr. Kertesz that he would continue operating under the same employment.

117.     On August 14, 2019, Mr. Kertesz had a doctor's appointment at UPenn.  That evening, the billing director called Mr. Kertesz and informed him that he had been approved for the Proton treatment.

118.     On August 15, 2019, at 8:15 am, Charlie Creighton, Scott Creighton, and Lauren Lamb (HR assistant) called Mr. Kertesz and informed him that they were sending him FMLA documents overnight in the mail to New Jersey.  At 9:36 am, after confirming with UPenn that the treatment had been approved, Mr. Kertesz emailed Charlie Creighton to let him know.

119.     On or about October 31, 2019, approximately 11 days before Mr. Kertesz's supposed FMLA was due to expire, the defendants sent Mr. Kertesz a new employee agreement demoting him in terms of job responsibilities, compensation, and commission potential.

120.     On or about November 25, 2019, approximately five days after Mr. Kertesz informed the defendants that he potentially may need a work accommodation, he was terminated.

121.     Individually identifiable health information created, received, or maintained by a covered entity in its capacity relative to the group health plan is protected health information. The use or disclosure of health information for employment-related decisions is prohibited by New Jersey State Law.

**COLONY TIRE'S REPEATED INVASION OF PRIVACY VIOLATIONS**

122.     Without Mr. Kertesz's consent, On July 23, 2019, Scott Creighton responded to an email in which several employees were included, telling the participants the following: "*Erik is meeting with doctors to treat [h]is newfound cancer.*"

123.     Without Mr. Kertesz's consent, On August 16, 2019, Charlie Creighton sent an email to all users (Over 600 employees) at Colony Tire Corporation, announcing Mr. Kertesz's cancer diagnosis.

124.     Without Mr. Kertesz's consent, on September 11, 2019, Scott Creighton responded to an email from a TBC sales representative, stating that Mr. Kertesz was "out until sometime in October being treated for a *cancerous tumor in his throat*."

125.     Without Mr. Kertesz's consent, on October 7, 2019, Scott responded to an email from a Yokohama sales representative stating the following: "*still out finishing up chemo & radiation for cancer*."

## MR. KERTESZ CONFRONTS SCOTT CREIGHTON
## FOR ENGAGING IN HIPAA VIOLATIONS

126.     On October 18, 2019, at 3:32 pm, Scott Creighton purposefully directed an email to two New Jersey vendors and 13 other vendors, 202 Atlantic Tire employees, and sales representatives.  Scott Creighton said the following:

> "After talking to many of you about the incentive trip and asking Luxe Travel if we could postpone the trip to 2021, we have decided to postpone the Atlantic Tire incentive trip to 2021.  ***Due to Erik's <u>illnesses</u> this year*** and me doing a terrible job of taking his place in motivating you so you could get the FULL benefits of offering a trip to our customers…."

127.     On November 13, 2019, in an email with the subject "November 4, 2019, Jamaica Trip Update," Mr. Kertesz confronted Scott Creighton for disclosing his Personal Health Information to vendors, employees, and sales associates.

128.     Twelve days after confronting Scott Creighton about disclosing his Personal Health Information, in retaliation, Scott and Charlie Creighton terminated Mr. Kertesz.

129.     Throughout his nearly 30-year career in the tire industry, Mr. Kertesz developed a strong relationship with these vendors—so much so that he knew them on a first-name basis.  After this invasion of privacy, Mr. Kertesz was inundated with calls from vendors regarding his health.  The tire industry is a small, tight-knit community, and it is even smaller in New Jersey.

///
///
///
///
///
///
///

18

**COLONY TIRE, ACTING AS PLAN ADMINISTRATOR, FIDUCIARY, PLAN SPONSOR, AND AGENT FOR THE LEGAL PROCESS OF THE GROUP HEALTH PLAN HAS FEDERAL COMPLIANCE RESPONSIBILITIES**

130.    As per the Summary Plan Description Colony Tire is the Plan Sponsor, Plan Administrator, Fiduciary, and Agent for the Service of Legal Process.

131.    Self-insured group health plans that cover 50 or more participants come under all applicable federal laws, including the Employee Retirement Income Security Act (ERISA), Health Insurance Portability and Accountability Act (HIPAA), Consolidated Omnibus Budget Reconciliation Act (COBRA), the Americans with Disabilities Act (ADA), the Pregnancy Discrimination Act, the Age Discrimination in Employment Act, the Civil Rights Act, and various budget reconciliation acts such as Tax Equity and Fiscal Responsibility Act (TEFRA), Deficit Reduction Act (DEFRA), and Economic Recovery Tax Act (ERTA)

132.    Colony Tire, its third-party business associates, and any others acting on behalf of the Plan must comply with all applicable requirements of the HIPAA Privacy Rules and/or all other applicable Federal rules.

133.    Employers sponsoring a self-insured health plan should designate a Privacy Officer to oversee the development, implementation, maintenance of, and adherence to privacy policies and procedures regarding the safe use and handling of protected health information (PHI) in compliance with HIPAA and with any applicable laws.

134.    During depositions in Kertesz 1, Plaintiff learned that defendant Colony Tire does not have a privacy officer or any other person specially assigned to oversee the development, implementation, maintenance of, and adherence to privacy policies and procedures regarding the safe use and handling of protected health information (PHI) in compliance with HIPAA and with any applicable laws.

135.    If the employer, acting in its capacity as Plan Administrator, obtains access to an employee's PHI, this makes it subject to the Privacy Rules as a Covered Entity. If the information is not obtained according to written authorization the employer will have violated the Privacy Rules.

136.    Plaintiff did not give Defendant Colony Tire written authorization and/or permission to discuss/and or disclose any of his protected health information. Defendant

Colony Tires' disclosure of Mr. Kertesz's protected health information was not for any HIPAA-covered transactions.

137.    According to Defendant Colony Tire's Summary Plan Description, the following is true:

    b.    Defendant Colony Tire's Plan Employer Identification number is 56-2167232,

    c.    Defendant Colony Tire's Plan Number is 502,

    d.    Defendant Colony Tire's Group Number is: LT

    e.    Defendant Colony Tire's Plan Funding Method: the employer pays plan benefits and administrative expenses directly from general assets.  Contributions received from covered persons are used to cover Plan costs and are expected immediately.

## REQUEST FOR REASONABLE ACCOMMODATION
## FOR CONTINUED TREATMENT

138.    On November 20, 2019, Mr. Kertesz informed senior management and the HR manager that upon recommendation from his doctor, he required weekly treatments for lymphedema that had developed because of his chemotherapy treatment.  Mr. Kertesz assured them that it wouldn't impact his ability to work, but he may need some flexibility in his work schedule.

139.    Ultimately, Mr. Kertesz was denied this request when he was terminated five days after he informed the Defendant that he would need accommodations and 12 days after he confronted individual defendants about their malicious, unauthorized disclosure of his personal health information.

## MR. KERTESZ IS TERMINATED FOR REQUESTING
## REASONABLE ACCOMMODATIONS

140.    On November 25, 2019, Charlie called Mr. Kertesz to his office and handed him a termination letter.  Dennis O'Shell (CFO) and Adora Ambrose, the HR manager, attended this meeting.

## NEW JERSEY WAGE PAYMENT LAW VIOLATIONS

141.    At the time Plaintiff was forced to take medical leave for the cancer in his throat, Defendants Scott and Charles Creighton were fully aware and familiar with the rules surrounding the Family Medical Leave Act (FMLA).

142.     In a deposition on January 12, 2024, Scott Creighton admitted to lying to Defendant Colony Tires' stop loss insurance carrier (Cigna) concerning Plaintiff Kertesz's FMLA leave for his heart attack in the first quarter of 2019.

143.     Defendant Scott Creighton admitted that Cigna raised concerns that Plaintiff was racking up medical bills for his heart attack, yet he had not taken any time off.

144.     Defendant Scott Creighton acknowledged that Plaintiff could work remotely from New Jersey during his cancer chemotherapy treatment.

145.     Defendant Scott Creighton admitted that he was Plaintiff Kertesz's manager.

146.     Defendant Scott Creighton stated on a recording, which he authenticated, that Plaintiff could continue to work from New Jersey, but the company would still have to place him on FMLA leave as he underwent chemotherapy.

147.     On 8/14/2019, the Plaintiff was forced out on FMLA leave.

148.     While on forced FMLA leave, Plaintiff worked every day, performing the same tasks and job functions he was required to do daily as if he had never been placed on FMLA leave.

149.     While on forced FMLA leave, the Plaintiff continued to work full time as if he were not on FMLA leave, but he was not compensated through his regular base salary.

150.     The Plaintiff was forced to use his accrued sick time and vacation time.

151.     From 8/14/2019 to 11/11/2019, Plaintiff worked daily; therefore, he should have been paid his regular pay, not through his earned sick time and vacation time.

152.     Until the issue surrounding Plaintiffs FMLA leave compensation was explored and discovered in Scott Creighton's deposition, Plaintiff was unaware that he was supposed to be compensated through his regular pay for his work from 8/15/19-11/11/29 and not through his vacation and sick pay.

153.     While on FMLA leave, in addition to being forced to use his sick and vacation time, Plaintiff had to write three personal checks ($845.00 each) for his payroll benefit deductions (medical, dental, and prescription).   Defendants would have paid these deductions through regular payroll deductions had they paid Plaintiff his regular base salary for the work he did while he was on forced FMLA leave.

154.     Defendants unjustly enriched themselves by getting the benefit of Plaintiff's labor in exchange for sick time and vacation time, which were benefits earned by and owed to Plaintiff.

155.     Furthermore, when this happened, Defendants knew that Plaintiff was working and had instructed their Human Resource Manager, Adora Ambrose, to exhaust all of Plaintiffs' sick and vacation time for FMLA compensation.

156.     Adora Ambrose was then instructed to dock the Plaintiff's salary for any follow-up medical visits he needed when he returned to work from leave.  These deductions would not have been necessary if the Plaintiff had not been stripped of his earned sick and vacation time.

### UNJUST ENRICHMENT

157.     As detailed above and discovered in Scott Creighton's deposition, the Defendants knew that the Plaintiff could work from 8/14/2019 to 11/11/2019 without the need to take FMLA leave or use his sick or vacation time.

158.     During his deposition, Defendant Scott Creighton authenticated an audio recording of himself and Plaintiff where Plaintiff expressly stated that he could work through his chemotherapy treatment and wanted to continue working until he felt that he could no longer do so.

159.     Defendant Scott Creighton admits that he forced Plaintiff out of FMLA leave to avoid having to explain to their new stop loss insurance carrier (Employer Benefit Underwriters, Inc. (EBU)) why Plaintiff was not on medical leave even though he was undergoing cancer treatments.

160.     As detailed above, Defendants forced Plaintiff out on FMLA leave.

161.     As detailed above, the Plaintiff worked the entirety of the FMLA leave.

162.     Defendants used Plaintiff's earned sick and vacation time to compensate Plaintiff during his FMLA leave.

163.     Defendants did not pay Plaintiff his base pay for his work while he was working on FMLA leave.

164.     Defendants were unjustly enriched when they received the benefit of Plaintiff's labor from 8/14/19-11/11/19 and did not compensate him for it.

**TORTIOUS INTERFERENCE OF PROSPECTIVE EMPLOYMENT OPPORTUNITY**

165.     Charles Creighton's disdain for Plaintiff was palpable during his deposition in the Kertesz 1 lawsuit.

166.     Charles Creighton showed no remorse for the harm he caused the plaintiff through his illegal disclosure of the Plaintiff's private health information.

167.     When asked if there was anything he would have done differently (presumably not disclosing the plaintiff's health diagnosis and instructing his staff to disclose the same to defendant vendors), Charles Creighton responded no. He said he would have done it all over again because that is the way he does things.

168.     Charles Creighton points out that his actions were consistent with a pattern of practice he has followed for over 30 years as the owner and CEO of Colony Tire.

169.     Charles Creighton shared the fact that he regretted hiring Plaintiff.

170.     On the other hand, Scott Creighton acknowledged the harm his actions caused Plaintiff, yet he stopped short of sharing that he would have done things differently.

171.     Scott Creighton expressed that his only regret is having to sit in deposition and deal with a lawsuit because of his actions.

172.     The sheer contempt Scott and Charles Creighton exhibited towards Plaintiff clearly exhibited a desire of Scott and Charles Creighton to get revenge against plaintiff.

173.     During their deposition, Scott and Charles Creighton acknowledged their relationships and partnerships in the tire industry, saying they have over 100 vendors. They are also politically connected, as they sit on various boards and have procured several government contracts.

174.     Upon information and belief, Scott and Charles used their relationships and influence to intentionally blacklist Plaintiff from ever being employed within the tire industry.

175.     This is evidenced by the fact that Plaintiff received several job offers from vendors and clients of Defendant corporation, and within 24 hours of those prospective employers speaking with Scott and Charles Creighton regarding Plaintiff's employment, the job offers were all rescinded, and the vacancy was reposted days later

///
///
///

**COUNT ONE**
**TORTIOUS INTERFERENCE OF PROSPECTIVE EMPLOYMENT**
**AGAINST DEFENDANTS**

176.    Mr. Kertesz repeats and realleges by all of the paragraphs above as though fully set forth herein.

177.    An action for tortious interference with a prospective business relation or employment relationship protects the right "to pursue one's business, calling or occupation free from undue interference or molestation." *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 586, 175 A. 62 (E. & A. 1934).  In its opinion in *Printing Mart-Morristown v. Sharp Elecs. Corp.*, the Supreme Court delineated the elements of a cause of action for tortious interference:

178.    A complaint based on tortious interference must allege facts that show some protectable right -- a prospective economic or contractual relationship.  Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some "reasonable expectation of economic advantage." A complaint must demonstrate that a plaintiff was in "pursuit" of business.  Second, the Complaint must allege facts claiming that the interference was done intentionally and with "malice." For purposes of this tort, "[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff." Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse.  Third, the Complaint must allege facts leading to the conclusion that the interference caused the loss of prospective gain.  A plaintiff must show that "if there had been no interference [,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." Fourth, the Complaint must allege that the injury caused damage.  [116 NJ 739, 751-52, 563 A.2d 31 (1989) (internal citations omitted).]. *Weisgarber v. N.J. Dep't of Cmty. Affairs*, No. A-0286-07T2, 2009 NJ Super.  Unpub. LEXIS 2441, at *8 (Super. Ct. App. Div. October 2, 2009).

**TAG**

179.    On or about January 2020, while in New Jersey and Essex County, Plaintiff applied for (was in pursuit of employment) over 11 job vacancies with TAG and listed Colony Tire, Scott Creighton, and Charles Creighton as the managers to contact for a reference.

180.     The Plaintiff was qualified for all the positions he applied to and had been a member of TAG for over a decade.  The Plaintiff was interviewed for several positions and received a tentative offer predicated on his references from Colony Tire.  Without explanation, within 24 hours of speaking with Charles and Scott Creighton, the offer of employment was rescinded, and TAG reposted the vacancy to its platform.  The position remained vacant for several months after.  Plaintiff reapplied and was never provided another opportunity to interview for any vacancies at TAG.  The Plaintiff was rejected for all 11 vacancies after TAG's human resource management called Colony Tire and spoke with Charles and Scott Creighton.

**Simple Tire**

181.     On or about January 2020, Plaintiff applied for the Director of Installation with Simple Tire.  The Plaintiff was qualified for the positions he applied for.  The Plaintiff went through two rounds of interviews and was informed by the COO, Josh Chafolsy, that he had the job and would be contacted to learn the next steps.  Mr. Chafolsy said he had to speak with Charles Creighton to check the Plaintiff's employment re-current, and the Plaintiff reinstated his application and was some.  Less than 24 hours later, Plaintiff was notified by Simply Tire's HR personnel that the position had been pulled.  They then proceeded to repost the position, and Plaintiff reinstated his application, which was summarily denied.

**Raison Tire North America**

182.     On or about January 2024, Plaintiff applied for the Director of Logistics position with Raison Tire North America.  The Plaintiff was qualified for the positions he applied for.  Jim Mayfield is the President of Raison North America.  Jim initially interviewed Plaintiff on 1/17/2024.  There was a second interview on 1/19/2024, which included Plaintiff Jim, Rakesh Amol, Global President of Raison Tire, and Brian Sheehey, Senior Vice President of North America.

183.     The feedback regarding the Plaintiffs' interviews was extremely positive.  After the interviews, the Plaintiff spoke with Jim Mayfield again, and he offered the position.  Jim sent the offer, and the Plaintiff was agreeable to the terms of the job offer.  Jim informed

25

the Plaintiff that he intended to call Charles and Scott Creighton, two individuals whom he had known for many years and would be in touch soon thereafter.  Within 24 hours of speaking with Scott and Charles Creighton, Jim pulled the job offer from the Plaintiff.

**Tire Agent**

184.    On or about February 2024, Plaintiff applied for the Manufacturer Coordinator position with Tire Agent.  The Plaintiff was qualified for the positions he applied for.  A recruiter contacted the Plaintiff on 3/06/2024 and scheduled the first interview.  It was on 3/8/2024 with an HR manager.  The Plaintiff had a second interview 3/14/2024 with the Senior VP of Finance.  The third interview was on 3/18/2024 with the CEO.  The interview went very well, but towards the end, the CEO asked Plaintiff if I knew Ron Causey at Atlantic Tire.  Plaintiff said he knew Ron because he had been a salesperson at Atlantic Tire, who directly reported to Plaintiff during his time as General Manager with Colony Tire.  Ron Causey is also a close family friend of Scott and Charles Creighton and the person who was given the Plaintiff position at Atlantic Tire when the Plaintiff was terminated.  The CEO was excited and offered Plaintiff the position pending his reference check with the defendants.

185.    Shortly after the interview, Plaintiff reached out to the CEO and the recruiter to check the status of his start date.  The recruiter sent Plaintiff an email on 3/30/24 stating that "the position has been put on hold for now due to some issues, once it reopens, I will reach out to you."  Two days later, on April 1, 2024, another position was posted on LinkedIn.  It was listed with a different title but was identical in terms of job responsibilities.  The Plaintiff applied for this position and contacted the recruiter, but neither the recruiter nor the CEO responded to the Plaintiff.

**Sumitomo Corporation**

186.    On or about April 26, 2024, Plaintiff applied for the Commercial Tire National Sales Manager (East) position with Sumitomo Corporation.  The Plaintiff was qualified for the positions he applied for.  Colony/ Atlantic Tire is Sumitomo's largest customer in North America.  During his interview, the Director of Commercial Tire asked Plaintiff about his employment at Colony/ Atlantic Tire and was excited to have Plaintiff and his experience join Sumitomo Corporation.

187.        The interview ended well, and the interviewer indicated that he would contact the Plaintiff the following week after he checked the Plaintiff's references at Colony Tire.  The Plaintiff did not hear back from him within the time frame he indicated, so the Plaintiff followed up about two weeks later.  To date, there has been no further response.

**Scott and Charles Creighton Showed Little To No Remorse For The Harm Caused By Their HIPAA Violations**:

188.        During their depositions, Charles Creighton showed no remorse for the harm he caused the plaintiff through his illegal disclosure of the Plaintiff's private health information. When asked if there was anything he would have done differently (presumably not disclosing the plaintiff's health diagnosis and instructing his staff to disclose the same to defendant vendors), Charles Creighton responded no. He said he would have done it all over again because that is the way he does things. On the other hand, Scott Creighton acknowledged the harm his actions caused Plaintiff, yet he stopped short of sharing that he would never repeat the same behavior.  In fact, the only regret he had was being sued as a result of his HIPAA violations.

189.        Scott and Charles Creighton's lack of remorse evidences their disdain for Plaintiff and provides a motive for their campaign to blacklist Plaintiff from the tire industry.

**Plaintiff Suffers From The Aftermath of Defendants' Illegal Disclosure Of His Private Health Information**:

190.        From July 2023 to the present, Plaintiff applied for over nine positions with TBC Corporation and did not get a single interview for any of them.  TBC is a large vendor of Colony/ Atlantic Tire.  As noted in the Complaint, TBC is one of the companies that Scott Creighton shared Plaintiff's private health information via email.  (**See Attachment A**). This was done without the Plaintiff's knowledge or consent.  Plaintiff applied for the following positions for which Plaintiff was qualified.

    a.  **6/3/2024** Director (Supplier Relations Manager) Commercial Tire,

    b.  **4/29/2024** Director, Distribution Center Network Optimization,

    c.  **3/13/2024** Director Distribution Center Operations,

    d.  **3/7/2024** Car Dealer Development Manager,

    e.  **2/22/2024** Director of Car Rental Fleet,

      f.  **1/02/2024** Director of Business Development and TBC National Account Executive,

      g.  **9/06/2023** Big O Tires Operation Manager, and

      h.  **7/15/2023** Zone Vice President of Sales.

191.     Under information and belief, the negligent, reckless, careless, willful, and wanton disclosure of Mr. Kertesz's highly sensitive medical information and his right to work and or apply for work without an incumbrance by his disgruntled ex-employer.

192.     As a result of the unlawful disclosure and invasion of privacy of the Defendants described herein, Mr. Kertesz has suffered, experienced severe emotional distress, suffered conscious pain and suffering, and was caused to suffer and sustain severe and disabling emotional injuries and insult, severe emotional distress, permanent injury with the physiological consequence, and has been and will in the future be caused to obtain medical treatment and has been and will in the future be caused to refrain from her normal pursuits. The severity and permanency of Plaintiff's injuries have required and will continue to require his expenditure of large sums of money for necessary care and treatment.

**WHEREFORE,** Mr. Kertesz demands that judgment be entered against the Defendants and seeks the following relief:

      a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

      b.  Punitive damages;

      c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

      d.  Such other relief as the Court may deem just and appropriate under the circumstances.

## <u>COUNT TWO</u>
## <u>NEW JERSEY WAGE PAYMENT LAW VIOLATIONS</u>
## <u>AGAINST DEFENDANT COLONY TIRE</u>

193.     Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

194.     NJSA 34:11-4.2 requires that "every employer shall pay the full amount of wages due to their employees at least twice during each calendar month, on regular paydays designated in advance by the employer…"

195.     Defendant Colony Tire is considered an employer as defined by the New Jersey Wage Payment Law, NJSA 34:11-4.1 et seq., and all regulations adopted pursuant thereto ("NJWPL")

196.     The Plaintiff was an employee, as defined by the NJWPL.

197.     Plaintiff worked for Defendants from 8/14/2019 to 11/11/2019, for which he did not receive regular wage payment in accordance with the NJWPL.  (See **Attachment B**, the emails, text messages, and phone call logs evidencing Plaintiff consistently worked from 8/14/2019 to 11/11/2019).

198.     The NJWPL required Defendant to pay Plaintiff at least the minimum wage on a regular pay schedule.

199.     Defendant's failure to pay Plaintiff's wages on time and in full constituted numerous violations of the NJWPL.

200.     As a result of the violations of the NJWPL committed by Defendant, Plaintiff has suffered significant damages.

**WHEREFORE,** according to the New Jersey Wage Payment Law, under NJSA 34:11-4.10, and/or any other applicable statutory or case law, Plaintiff demands judgment against Defendants, jointly and/or severally, for all available damages by law or equity together with interest, including actual lost wages and statutory liquidated damages of 200 percent of the wages due, costs, and attorney's fees; punitive damages; injunctive relief, including all appropriate measures to force compliance with all state and federal wage laws; and such other relief as the Court may deem appropriate.

## COUNT THREE
## NEW JERSEY WAGE PAYMENT LAW – RECORD-KEEPING VIOLATIONS AGAINST DEFENDANT COLONY TIRE

201.     Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

202.     Under the NJWPL, employers must keep and maintain employee payroll records for at least six years reflecting, inter alia, the hours worked and pay received by each employee.

203.     Defendants failed to maintain complete and accurate records of, *inter alia*, the pay received and work completed by Plaintiff Kertesz.

204.     As such, the Defendants are in violation of the NJWPL record-keeping requirements regarding the employment of Plaintiff Kertesz.

**WHEREFORE,** Plaintiff demands that judgment is entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT FOUR
## NEW JERSEY WAGE PAYMENT LAW – UNLAWFUL DEDUCTIONS
## AGAINST DEFENDANT COLONY TIRE

205. Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

206. NJSA § 34:11-4.4 prohibits employers from withholding or diverting any portion of an employee's wages unless the amounts withheld or diverted fall under one of several specified categories.

207. Defendants violated the NJWPL by withholding the entirety of Plaintiff's base salary and instead compensating Plaintiff through sick leave even though Plaintiff was not sick, as well as vacation leave even though Plaintiff was not on vacation. These deductions are not permitted. Furthermore, by the NJWPL

208. does not permit the intentional taking of Plaintiff's earned base salary, Defendants have willfully violated NJSA § 34:11-4.1, *et seq.*, and the supporting New Jersey Department of Labor and Workforce Development Regulations.

209. As a result of Defendant's willful violations of the NJWPL, Plaintiff is entitled to recover from Defendant unpaid wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action.

**WHEREFORE,** Plaintiff demands that judgment is entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

///
///
///
///

## COUNT FIVE
## NEW JERSEY WAGE PAYMENT LAW – RETALIATION
## AGAINST DEFENDANT COLONY TIRE

210.     Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

211.     The NJWPL prohibits retaliation by employers against employees who complain of or oppose employers' unlawful pay practices.

212.     Plaintiff was an employee of Defendants within the meaning of the NJWPL.

213.     Defendants were employers of Plaintiff within the meaning of the NJWPL.

214.     While employed by Defendants and after Plaintiff returned from forced FMLA leave, he complained to Defendants about their unlawful employment practices, including their unlawful deduction of his wages for his needing accommodation to visit his medical provider for a follow-up visit.  This was done even though Plaintiff worked for Defendants Monday through Sunday, as Plaintiff testified in deposition that he did not have an off day.

215.     The Plaintiff's complaints constitute protected activity under the NJWPL.

216.     Within a week of Plaintiff's complaints to Defendants, Defendants terminated Plaintiff's employment.

217.     A causal connection exists between Plaintiff's complaints of Defendants' unlawful wage deductions and Defendants' termination of Plaintiff's employment.

218.     Because Defendants took adverse employment actions against Plaintiff within a week of his complaints of Defendants' NJWPL violations, Plaintiff is entitled to a presumption that Defendants' adverse employment actions were taken against Plaintiff in retaliation for his complaints.

219.     Defendants retaliated against Plaintiff after and because of his complaints of Defendants NJWPL violations by terminating his employment.

220.     Due to Defendant's violations of the anti-retaliation provisions of the NJWPL, Plaintiff is entitled to recover from Defendant's lost wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action.

**WHEREFORE,** Plaintiff demands that judgment is entered against Defendants and seeks the following relief:

31

    a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

    b. Punitive damages;

    c. Attorney fees, pre-and post-judgment interest, and cost of suit;

    d. Such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT SIX
## UNJUST ENRICHMENT
## AGAINST DEFENDANT COLONY TIRE

221.    Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

222.    To state a claim for unjust enrichment under New Jersey law, a plaintiff must allege that "(1) at Plaintiffs' expense (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Arlandson v. Hartz Mt. Corp.*, 792 F. Supp. 2d 691, 711 (DNJ 2011) (internal quotation and citation omitted). *Conte v. Promethean Inc.*, No. 21-20490 (KM) (JBC), 2022 US Dist. LEXIS 178641, at *17-18 (DNJ September 30, 2022).

223.    As detailed above and discovered in Scott Creighton's deposition, the Defendants knew that the Plaintiff could work from 8/14/2019 to 11/11/2019 without the need to take FMLA leave or use his sick or vacation time.

**At Plaintiffs Expense**:

224.    The Plaintiff worked from 8/14/2019-11/11/2019 and was compensated through his earned sick time and earned vacation time. The Plaintiff did not want to take FMLA leave as the Plaintiff believed he could continue to work although he had to undergo chemotherapy. The Plaintiff went so far as to schedule all of his chemotherapy treatments for times that would not result in his absence from his day-to-day job during the day. Plaintiff suffered the expense of working, with no base pay, and a loss of Plaintiff's sick and vacation time.

**Defendant Received Benefit**:

225.    During his deposition, Defendant Scott Creighton authenticated an audio recording of himself and Plaintiff where Plaintiff expressly stated that he could work through his

chemotherapy treatment and wanted to continue working until he felt that he could no longer do so.

226.       Defendant Scott Creighton admits that he forced Plaintiff out of FMLA leave to avoid having to explain to their new stop loss insurance carrier (Employer Benefit Underwriters, Inc. (EBU)) why Plaintiff was not on medical leave even though he was undergoing cancer treatments.

227.       Although Defendants forced Plaintiff on FMLA leave, they required Plaintiff to continue to work his normal full-time schedule.  As evidenced by the attached text messages and emails, Plaintiff worked all day every day from 8/14/19-11/11/19.  Scott Creighton emailed and texted the defendants while the Defendant was on forced medical leave.  They demanded reports, reviews, and client interactions.  The Plaintiff was required to continue the day-to-day operation and manage his staff of over 200.

228.       Defendants secured the benefit of Plaintiff's labor and the benefit of Plaintiff exhausting all of Plaintiff's sick and vacation time (which is earmarked as work-free benefits) for nothing.

229.       Defendants knew that they were required to compensate Plaintiff at least $39,500.00 per month for the labor that he provided to Defendants.  Defendants did not compensate Plaintiff his $39,500.00 monthly wage.  They pocketed it.

**The circumstances that would make it unjust for the Defendant to retain the benefit without paying for it**:

230.       As detailed above, the Plaintiff worked the entirety of the FMLA leave.  The Plaintiff was on FMLA leave in name only.

231.       If Plaintiff did not require chemotherapy treatment for the tumor in his throat, Plaintiff would not have been forced out on FMLA leave.  The sole purpose of Defendants forcing Plaintiff to take FMLA leave was to avoid alarming their stop loss insurance provider (EBU) when EBU began receiving Plaintiff's chemotherapy treatment bills, which were over 1 million dollars.  Defendants admitted they were afraid of their stop loss insurance carrier refusing to pay the chemotherapy bills if they saw that Plaintiff was not on FMLA leave.  Defendants admitted to being a self-funded employer health plan that paid for their employees' healthcare costs out of the company's general assets.  If their stop loss insurance carrier refused to pay Plaintiff chemotherapy bills, then Defendants would be stuck paying the over $1 million-dollar medical bill themselves.

232.     Defendants' use of Plaintiff's earned sick and vacation time to compensate Plaintiff during his FMLA leave robbed Plaintiff of his earned sick and vacation time.  When Plaintiff "officially" returned to work on 11/11/2029, Plaintiff discovered that he had lymphedema.  The Plaintiff required limited time off to attend therapy for his lymphedema. Plaintiff could not use his previously earned sick and vacation time because Defendants made Plaintiff exhaust that time during the forced FMLA leave.  As a result, when Plaintiff informed Defendants that he required treatment for his lymphedema, Defendants informed Plaintiff that they would dock his pay for the hours missed for his lymphedema treatment.

233.     In the end, the Plaintiff lost twice.  He lost his accrued vacation and sick time and his base salary for the work he did from 8/14/2019 to 11/11/2019.  As a result, when he desperately needed his sick and vacation time for his lymphedema treatment, there was no time available.

234.     Defendants were unjustly enriched when they received the benefit of Plaintiff's labor from 8/14/19-11/11/19, the value of Plaintiff's sick and vacation leave while pocketing Plaintiff's base pay and employer contribution pay deductions.  They did not compensate Plaintiff for the time he worked.

**WHEREFORE,** Plaintiff demands that judgment is entered against Defendants and seeks the following relief:
   a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;
   b.  Punitive damages;
   c.  Attorney fees, pre-and post-judgment interest, and cost of suit;
   d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### COUNT SEVEN
### NJLAD RETALIATION
### AGAINST DEFENDANT COLONY TIRE

235.     Mr. Kertesz repeats and realleges by reference all paragraphs as though fully set forth herein.

236.     The elements of a prima facie NJLAD retaliation claim are the same as for a retaliation claim under the FMLA — a "[p]laintiff must demonstrate by a preponderance of the evidence that (1) she engaged in protected activity—here, a request for a reasonable accommodation; (2) she suffered an adverse action; and (3) a causal connection exists

between the protected activity and the adverse action." Foster v. Kennedy Univ. Hosp., Inc., Civil Action No. 20-4415 (KMW-MJS), 2022 US Dist. LEXIS 134558, at *31 (DNJ July 28, 2022).

**Engaged In A Protected Activity**:

237.     As detailed above, Plaintiff engaged in protected activity when he requested NJLAD-protected accommodations for his lymphedema.

**Suffered An Adverse Action**:

238.     As detailed above, the Plaintiff was forced to take premature FMLA leave and did not have any sick or vacation time to cover his lymphedema therapy treatments.  He was ultimately terminated after he protested the unauthorized disclosure of his personal health information, the unauthorized deductions from his salary, and the rejection of his NJLAD medical leave and accommodations requests.

**Causal Connection Exists Between The Protected Activity And The Adverse Action**:

239.     But for Mr. Kertesz's cancer diagnosis, subsequent lymphedema, and request for accommodations, the defendants would not have terminated his employment.  The Defendants terminated Mr. Kertesz within a week, if not a few days, of his complaints regarding the rejection of his accommodation request and the unauthorized disclosure of his personal health information.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;
b. Punitive damages;
c. Attorney fees, pre-and post-judgment interest, and cost of suit;
d. Such other relief as the Court may deem just and appropriate under the circumstances.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;
b. Punitive damages;
c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d.   Such other relief as the Court may deem just and appropriate under the circumstances.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

## **DEMAND FOR THE PRODUCTION OF INSURANCE AGREEMENTS**

According to R. 4:10-2(b), demand is at this moment made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.  If so, please attach a copy of each, or alternative state, under oath and certification: (a) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all person insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

## **CERTIFICATION ACCORDING TO R.4:5-1**

I certify that the matters in controversy in this action are not subject to any other action pending in any other court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

## **JURY DEMAND**

Plaintiff Kertesz hereby demands a trial by jury on all issues.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

36

## DESIGNATION OF TRIAL COUNSEL

TYRONE BLACKBURN, ESQ, is designated as trial counsel in this matter.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the Defendants and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

37

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies. Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Date: July 11, 2024

T. A. Blackburn Law PLLC

By: *Tyrone A. Blackburn, Esq.*

Tyrone Blackburn, Esq.

# Civil Case Information Statement

**Case Details: ESSEX | Civil Part Docket# L-004734-24**

**Case Caption:** KERTESZ ERIK  VS COLONY TIRE

**Case Initiation Date:** 07/11/2024

**Attorney Name:** TYRONE ANTHONY BLACKBURN

**Firm Name:** T. A. BLACKBURN LAW, PLLC.

**Address:** 1242 EAST 80TH ST 3RD FL
BROOKLYN NY 11236

**Phone:** 3473427432

**Name of Party:** PLAINTIFF : KERTESZ, ERIK

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: ERIK KERTESZ? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
        **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
        **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

07/11/2024
Dated

/s/ TYRONE ANTHONY BLACKBURN
Signed